IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JACKIE NEWMAN,                          )
                                        )
       Plaintiff,              )
                                        )   No. 3:05-0096
v.                                      )
                                        )   JUDGE TRAUGER
APRIA HEALTHCARE,                       )
                                        )
       Defendant.              )

# MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendant Apria Healthcare (Docket No. 39), to which the Plaintiff has responded (Docket No. 41). For the reasons stated herein, the defendant's motion will be granted.

## I.    Facts and Procedural History[1]

On November 17, 2003, plaintiff Jackie Newman was hired, subject to a 120-day probationary period, by defendant Apria Healthcare to work as a respiratory therapist at Apria's Nashville, Tennessee facility. At the same time that Apria hired the plaintiff, it also hired Crystal Corley and Brandy Draper, two of plaintiff's former co-workers from Sumner Regional Medical Center. These three women, under the direction of supervisor Iris White and branch manager Ted Wright, formed the entire respiratory therapy department staff at Apria.

---

[1] Unless otherwise noted, the facts have been drawn from Plaintiff's Responses to Defendant's Statement of Material Facts (Docket No. 48) and Defendant's Responses to Plaintiff's Statement of Material Facts (Docket No. 47).

Within a very short time after plaintiff was hired, White observed that the plaintiff's attitude and job performance were, in her estimation, rather poor. It is undisputed that plaintiff's deficiencies became apparent to White within the first two to four weeks of plaintiff's employment, although these deficiencies were not documented, through "Performance Logs" or otherwise, at this time. White testified, however, that there was counseling or discussions with the plaintiff prior to December of 2003. (White Depos. p. 83)

On December 19, 2003, approximately one month after plaintiff was hired, she tripped and injured her right knee in Apria's warehouse.[2] White witnessed the incident and immediately informed branch manager Wright about what had happened. Both White and Wright attended to the plaintiff. White then volunteered to take the plaintiff to the doctor's office for treatment.

When Newman returned from the doctor's office to the Apria facility, White was already in the process of making arrangements with Apria's workers' compensation insurance carrier so that the medical expenses incurred as a result of plaintiff's injury would be covered. According to the plaintiff, White told her that she was on the phone with "our insurance regarding what's going to be your workmen's comp on your knee." (Newman Depos. p. 52) While plaintiff does not recall filling out any kind of a report about her workers' compensation injury, she testified that she spoke to the individual on the phone and that they took a recorded statement from her regarding the injury. *Id*. at p. 144. Thereafter, plaintiff received treatment for her knee from a Dr. Dyer at Baptist CentraCare, coverage for which was provided by Apria's workers' compensation insurance. (*Id*. at pp. 144–145)

In the month following plaintiff's injury, White completed a total of four Performance

---

[2]Plaintiff suffered a torn meniscus, among other things. (Newman Depos. p. 47)

Log entries for plaintiff's personnel file detailing deficiencies in plaintiff's work performance and attitude. The first of these was completed as a result of an incident that purportedly occurred on December 23, 2004. The top portion of the Performance Log, which White testified was completed by Ted Wright (White Depos. p. 41), states that "Jackie made 1:00 Appointment with PT and went to lunch. PT waited until 1:20 to get service of Bi Pap set up. Unacceptable." (Docket No. 40–2, Exhibit 3). The bottom portion of the Performance Log, which White completed, states that she "[s]poke [with] Jackie and then all RT staff. RT Staff will stagger lunch shifts so that there will be RT in house @ all times. All RT's will [check] schedule book for after lunch appts. to be sure they are on time for appts. or another RT to cover." *Id*. According to the plaintiff, however, none of the facts documented in this Performance Log actually took place.

The second Performance Log was completed by White on January 15, 2004, as a result of an incident that allegedly took place on January 13, 2004. According to White, the Performance Log addresses "Jackie's negative attitude toward Apria and the function of how we received inventory in." (White Depos. pp. 46–47) The Performance Log itself states that plaintiff made a "harsh" comment in front of two other employees about the lack of equipment at Apria, and that White expects plaintiff to think about the effect such remarks have on coworkers.[3] (Docket No. 40–2, Exhibit 4) While plaintiff testified that the incident description in the Performance Log did not sound familiar to her, she admitted that she had a conversation with Jimmy Bess, the logistics manager at Apria, in which she asked him how soon they would be able to get the orders in, told him that they needed them pretty quickly, and commented that "we needed their supplies to be

---

[3]White did not document, nor could she recall, the names of the two employees who overheard the comment.

3

able to, you know, take care of patients." (Newman Depos. pp. 60–61) However, plaintiff testified that she did not remember making any comments about Apria to him or to anyone else that were "harsh." *Id.* at p. 61.

Shortly thereafter, a third Performance Log was completed by White regarding an incident that occurred on January 16, 2004, in which plaintiff resisted an assignment to set up a heart-lung monitor in the home of an infant who was being released from the hospital at a time when the other respiratory therapists were busy. According to White and the contents of the Performance Log, plaintiff pleaded, "please don't ask me to do this" and tried to get White to do the assignment. After White persisted, plaintiff did complete the task. (Docket No. 40–2, Exhibit 5; White Depos. pp. 51–52)

When questioned about the scenario described in the third Performance Log, plaintiff testified that it had "a ring of truth to it." (Newman Depos. p. 65) Plaintiff stated that she told White that "I didn't mind doing it, but I asked her if she would mind going to do it since it was near Columbia, Tennessee... that that was going to exceed the drive time limit that the doctors had imposed, and my knee was bothering me." (*Id.* at p. 66) Plaintiff also testified, however, that what upset her about the assignment was "the fact that they would hold tickets and not tell me and give me the courtesy of a call when I was in that area, bring me back in knowing I had a knee injury and then send me back out again." (*Id.* at p. 100)

On the same day that White prepared the third Performance Log concerning plaintiff's attempt to avoid the assignment involving the heart-lung monitor, January 19, 2004, White also finalized plaintiff's Performance Appraisal and discussed it with her. The "appraisal period" listed on the appraisal form indicates coverage from the period of plaintiff's hire, November 11,

4

2003, until December 31, 2003.  (Docket No. 40–2, Exhibit 6)  While the Performance Appraisal indicates that plaintiff's performance was deficient in two of the five categories, plaintiff received an overall job performance score of 2.6 out of a possible 5.0, placing her in the "Meets Expectation Category," which includes scores ranging from 2.5 to 3.49.  (*Id*.)  On the last page of the evaluation, White wrote a three-point list entitled "Goals for 2004," which included "increase productivity," "develop and maintain positive attitude in the workplace," and "improvability [sic] to adapt to change in schedule/workload."   (*Id*.)

With respect to the final goal concerning plaintiff's ability to adapt to a change in schedule and workload, White testified that, at some point, she introduced the idea of staggering work shifts with the therapists for the purpose of keeping overtime to a minimum.  According to White, plaintiff had been "very, very vocal about not wanting to do that."  (White Depos. at pp. 23–24) Plaintiff admits that she was opposed to a staggered shift schedule and acknowledges that she informed White that she would rather resign than work under a staggered shift arrangement that would require her to work past 5:00 p.m. on any regular basis.

White discussed each of these points with plaintiff during their January 19, 2004 meeting, although no specific time frame was given to the plaintiff in which to meet these goals.  As of January 19, 2004, White believed that, if plaintiff started showing improvement in her deficient areas, she could continue to work for Apria as long as she wanted.

However, on January 21, 2004, White documented that one of the other two respiratory technicians, Brandy Draper, had come to her and informed her, among other things, that "Jackie is planning to leave Apria after her knee is fixed.  She is trying to avoid 10-7 shift by getting appt. [with] orthopedist ASAP."  (Docket No. 40–2, Exhibit 7; White Depos. at pp. 54–55)   According

5

to the Performance Log, Draper also reported that Newman was planning to sue Apria for failure to provide 15 minute breaks and downtime, in the event that she was let go during her evaluation period. *Id*. White never discussed Draper's allegations with the plaintiff. (White Depos. p. 55)

On January 27, 2004, White completed a fourth Performance Log concerning the plaintiff's purported failure to report to work at the correct time for a "staggered shift" on January 26, 2004 and her failure to take the call box home with her while on call.[4] Plaintiff, however, denies both of the incidences described in the fourth Performance Log, claiming that she was not supposed to report to work as part of a staggered shift on January 26, 2004 and that she never failed to take the call box with her while on call. (Newman Depos. p. 101) According to the plaintiff, she was not supposed to report at the time alleged in the Performance Log "because I had already told them I wasn't going to do that, that I would resign. I never had agreed to be on a staggered shift." (Newman Depos. p. 97–98) However, plaintiff also testified that the staggered shifts never went into effect and that it was not possible that she was assigned to the staggered shift and simply ignored it. *Id*. at p. 98. White countered that, although the staggered shift "never did come to fruition," Apria attempted it for approximately one week. (White Depos. p. 31)

Also on January 27, 2004, White testified that she spoke with Brian Ego, Apria's regional director of human resources, to discuss Plaintiff's employment situation and what process should be followed to end plaintiff's employment during her probationary period. According to White, at that point in time, "[i]t was obvious that Jackie was not going to work out as a staff therapist with Apria.... She was very disgruntled with Apria, with the type of work." *Id*. at p. 62. White

---

[4]The call box contained various supplies that might be needed on an after-hours call, and its purpose was to keep the on-call employee from having to go all the way to the office to get supplies before handling a call. According to White, plaintiff's failure to take the call box home was "just another instance of nonconforming." (White Depos. at p. 59)

6

testified that, prior to her conversation with Ego, she and Ted Wright had decided that they were going to let Newman go. She also stated that there was no mention of plaintiff's workers' compensation claim during the conversation between her and Wright about terminating the plaintiff. Wright simply agreed that "it was time." (White Depos. p. 69)

Thereafter, White testified that she contacted Ego in order to find out how they should proceed with plaintiff's termination during her probationary period and also to determine whether Apria was still going to cover the medical bills related to plaintiff's December 19, 2003 fall and resulting knee injury. (*Id*. at p. 67) According to White, she asked Ego about the medical bills related to the injury because she "wanted to have everything in line" when she went to face Newman with their decision. *Id*. The Performance Log documenting the conversation between White and Ego states that, "[p]er Brian, Apria will be responsible for the workers' comp claim related to her fall and resulting injury. However, in light of the following issues, Jackie's dismissal will be appropriate under Apria employment policy." (Docket No. 40–2, Exhibit 9) The January 27, 2004 document then goes on to list as the reasons for termination: "(1) Low productivity (2) Negative attitude [and] (3) Unwillingness to contribute to team goals i.e. [decreased] overtime via staggered shifts." *Id*. Plaintiff was terminated by the defendant on January 28, 2004.

Upon her termination, plaintiff filed a workers' compensation claim. (Newman Depos. p. 49) Plaintiff admitted in her deposition that, after the phone call with Apria's workers' compensation insurance company, plaintiff never had any discussion with Iris White or Ted Wright about a workers' compensation claim, *id*. at pp. 52–53, and that she never heard either White or Wright talk with anyone about a workers' compensation claim regarding the injury. The

7

defendant denies that the workers' compensation claim had anything to do with the plaintiff's termination.

On December 28, 2004, Plaintiff filed an action for retaliatory discharge against Apria and Iris White in the Chancery Court for Davidson County, Tennessee. The matter was removed to this court on the basis of diversity jurisdiction and, by Order entered April 25, 2005, the court granted a 12(b)(6) motion to dismiss Iris White from the action. (Docket No. 16) On January 13, 2005, the defendant moved for summary judgment in this action. (Docket No. 39)

## II.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

8

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

### III. Retaliatory Discharge

Under Tennessee law,[5] a plaintiff asserting a cause of action for discharge in retaliation for filing a workers' compensation claim must first establish that: (1) the plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's

---

[5]The parties agree that Tennessee law applies to this cause of action.

9

employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate. *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558(Tenn. 1993); *see also Bates v. Cooper Indus., Inc.*, 957 F. Supp. 125, 127 (M.D.T.N. 1997). With respect to this final element of a retaliatory discharge claim– that of causation– the Tennessee Supreme Court has stated:

> Proof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury. However, proof of a causal link between the claim for benefits and the employee's discharge imposes upon the employer the burden of showing a legitimate, non-pretextual reason for the employee's discharge.

*Anderson*, 857 S.W.2d at 558–59. It is well-established in Tennessee that, "in order to establish the element of causation, the plaintiff must present some proof other than merely the facts showing her employment, her exercise of rights under the Workers' Compensation Law, and her subsequent discharge." *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 684–85 (Tenn. Ct. App. 1999) (citing *Thomason v. Better -Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992)). "The plaintiff may accomplish this goal either by presenting direct evidence of the necessary causal link or by introducing compelling circumstantial evidence of such a link." *Id.*

The record clearly reveals that Newman was employed by defendant Apria at the time of her injury on December 19, 2003 and that Apria terminated the plaintiff's employment on January 28, 2004. However, defendant asserts that there is no evidence from which a reasonable juror could conclude that the plaintiff's claim for workers' compensation benefits was a substantial factor in its decision to terminate the plaintiff. According to the defendant, plaintiff's own testimony that she did not file or mention filing a claim for workers' compensation benefits until after she was terminated, in combination with the fact that Apria made "every effort" to provide,

10

at their own expense, prompt medical attention for plaintiff following her injury and to confirm that coverage would continue irrespective of her employment status, precludes a finding of retaliatory motive on the part of the defendant.[6]

While plaintiff concedes that there is no direct evidence of a causal connection between her workers' compensation claim and termination, she asserts that there is sufficient circumstantial evidence of causal link based on the fact that: (1) she has denied the substance of the four Performance Logs detailing the alleged incidents of her poor job performance, (2) she was given a "meets expectation" job performance evaluation during the time in which she allegedly exhibited poor job skills, and (3) during the conversation in which plaintiff's supervisor White discussed with the regional head of human resources, Brian Ergo, the procedure to follow in effecting plaintiff's termination, plaintiff's "workers' comp claim" was also discussed. (Docket No. 41 pp. 4–6) Newman contends that, "given the fact that White testified she had no further dealings with plaintiff's workers' compensation claim after the date of initial accident and that it was handled by others, a reasonable inference may be drawn of improper motive and retaliation from the fact of White discussing the claim with corporate on the day before plaintiff's termination. (*Id*. at pp. 5–6) According to the plaintiff, "[t]his inference, along with the

---

[6]Defendant correctly notes, based on *Elliot v. The Blakeford at Green Hills*, No. M2000-00365-COA-R3-CV, 2000 Tenn. App. LEXIS 806 at * (Tenn. Ct. App. Dec. 13, 2000), that plaintiff's failure to officially file a workers' compensation claim until after her termination is not dispositive. Here, viewing the evidence in the light most favorable to the plaintiff, the fact that, immediately following her fall and resulting injury, Newman gave a recorded statement to Apria's workers' compensation insurance carrier, which plaintiff was told by White was for "what's going to be your workmen's comp on your knee" (Newman Depos. p. 52), is sufficient evidence, for purposes of a workers' compensation retaliatory discharge claim, that plaintiff "sought workers' compensation benefits" prior to her termination. In fact, during White's January 27, 2004, pre-termination conversation with Brian Ego, White herself makes reference to plaintiff's "worker's compensation claim related to her fall and resulting injury."

11

contradiction in testimony between White and the plaintiff as to the substance of the performance log incidents, creates credible circumstantial evidence of retaliatory discharge based upon the filing of the worker's compensation claim." (*Id*. at p. 6)

The court cannot agree. To begin, the substance of two of the four performance logs documenting plaintiff's deficiencies was actually buttressed by plaintiff's testimony. With respect to the second Performance Log, plaintiff may have disagreed as to the purported "harshness" of any statement made regarding how inventory was being received, but she did indeed acknowledge a conversation on the topic with Jimmy Bess, the logistics manager at Apria. Plaintiff also testified, with respect to the incident described in the third Performance Log regarding her resistance to a late assignment to set up a heart-lung monitor in the home of an infant, that it had a "ring of truth to it" and acknowledged that she asked White if White could complete the assignment instead. (Newman Depos. p. 65)

In addition, the fact that plaintiff was given a "meets expectation" appraisal during the time in which she allegedly exhibited poor job skills does not evidence a causal link between plaintiff's workers' compensation claim and her eventual discharge. First, the appraisal period listed in the Performance Appraisal only covered plaintiff's job performance until December 31, 2003 (Docket No. 40–2, Exhibit 6); thus, three of the four incidents described in the Performance Logs were not included in the evaluation. Second, plaintiff's job performance score of 2.6 rested at the very bottom of the "meets expectation" category, which ranged from 2.5 to 3.49. (*Id*.) And, third, the appraisal itself does take note of plaintiff's deficiencies, including as "Goals for 2004" a need for plaintiff to "increase productivity," "develop and maintain positive attitude in the workplace," and "improvability [sic] to adapt to change in schedule/workload." (*Id*.)

12

Finally, while White's mention of plaintiff's workers' compensation claim during her discussion with Ego does provide some circumstantial evidence of a causal link, it is not sufficient to survive summary judgment in light of White's un-rebutted testimony that the decision to terminate the plaintiff had already been made and White's legitimate explanation that she only asked about whether plaintiff's benefits would survive termination in order to fully prepare to respond to plaintiff's expected questions upon actual termination. It is also of great significance to the court that Apria, through Ego, determined that the workers' compensation benefits surrounding plaintiff's December 19, 2003 workplace injury were, in fact, due regardless of plaintiff's employment status and that Apria had previously provided care and coverage to the plaintiff without hesitation. In light of this record, there is simply no material evidence that the plaintiff's assertion of a claim for workers' compensation benefits was a substantial factor in the termination of her employment. Consequently, summary judgment in favor of the defendant will be granted.

### IV. Conclusion

For these reasons, the Motion for Summary Judgment filed by the defendant Apria Healthcare will be granted.

An appropriate order will issue.

_____

JUDGE ALETA A. TRAUGER

United States District Judge